# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DANNY R. NIX,

       Plaintiff,

v.                                                           CV 10-0809 WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Danny Nix filed applications for Social Security Disability Insurance benefits and Supplemental Security Income.  (Administrative Record (AR) 14, 79-86, 495-503.)  After an administrative law judge (ALJ) denied the applications and the Appeals Counsel upheld the ALJ's decision (AR 6-26), Nix filed a Motion to Reverse or Remand with this Court.  (Doc. 17.)  The Commissioner of Social Security has filed a Response (Doc. 19) and Nix has filed a Reply (Doc. 20).  The parties have consented to have me serve as the presiding judge in this case and enter final judgment pursuant to 28 U.S.C § 636(c) and FED. R. CIV. P. 73(b).  (Docs. 5, 9.)

For the reasons explained below, Nix's motion is granted and this case is remanded for further consideration consistent with this opinion.

### STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Grogan v. Barnhart*, 399 F.3d

1257, 1261 (10th Cir. 2005) (citation omitted).  "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Hamlin*, 365 F.3d at 1214 (citation omitted).  However, substantial evidence "requires . . . less than a preponderance," meaning that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  I may not "displace the [ALJ's] choice between two fairly conflicting views."  *Id.*   Additionally, while I must "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial," I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner.  *See Hamlin*, 365 F.3d at 1214.

The ALJ must as a matter of law: (1) support all of his required findings with substantial evidence; (2) consider all relevant medical evidence in making those findings; and (3) discuss uncontroverted evidence that he chooses not to rely upon and significantly probative evidence that he rejects.  *Grogan*, 399 F.3d at 1262 (citations omitted).  "Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is 'significantly probative.'" *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)).

### SEQUENTIAL EVALUATION PROCESS

The Social Security Administration has devised a five-step sequential evaluation process to determine disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).  At the first four steps, the claimant must show that he is not working in substantial gainful activity, that he has an impairment that is severe enough to significantly limit his ability to

2

do basic work activities, and either that the impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or that he is unable to perform the work he has done in the past. *Thomas*, 540 U.S. at 24; *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988). At the fourth step, the ALJ determines whether a claimant can perform his past relevant work after first evaluating the claimant's physical and mental residual functional capacity (RFC). *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). The claimant bears the burden of establishing a prima facie case of disability at steps one through four, but at step five the burden of proof shifts to the Commissioner. *Grogan*, 399 F.3d at 1261. At the fifth step, the Commissioner must show that the claimant retains a sufficient RFC to perform other jobs existing in significant numbers in the national economy, given the claimant's age, education, and work experience. *Id.*

## FACTUAL BACKGROUND

Nix protectively filed applications for SSDI and SSI benefits on March 19, 2008. (AR 79-86, 494-503.) After the Social Security Administration (SSA) denied Nix's applications at both the initial and reconsideration levels, Nix filed a timely request for a hearing before an ALJ. (AR 14, 53-55.) The hearing occurred on October 29, 2009 before ALJ Herbert J. Green. (AR 14.) Nix testified at the hearing and was represented by his counsel, Michael Liebman. (*Id.*) A vocational expert also testified at the hearing on the request of the ALJ. (*Id.*) The ALJ denied Nix's claims for benefits on February 17, 2010, and the Appeals Council denied Nix's subsequent request for review on July 29, 2010. (AR 6, 11.) As a result of the denial by the Appeals Council, the ALJ's decision became the final decision of the Commissioner. (AR 6.)

Nix alleged a disability onset date of April 2, 2007, at which time Nix was forty-nine years old. (AR 14, 79.) In his applications, Nix claimed that he was disabled due to back problems, headaches, chronic obstructive pulmonary disease (COPD), emphysema, blurry vision, depression

and anxiety.  (AR 99, 146-47)  Nix further claimed that these problems limited his ability to work by impairing his ability to sleep and breathe while performing simple tasks.  (AR 99.)

On April 2, 2007, Nix was admitted to the Dan Trigg Memorial Hospital after being involved in a car accident.  (AR 236-251.)  Nix had a strong smell of alcohol on his breath and a blood alcohol level of .217.  (AR 238.)  The emergency room physician, Dr. Badshah, assessed Nix as having an unstable C1 fracture with spinal subdural hematoma of the C-spine, right upper extremity abrasions and contusions, and upper back pain.  (AR 238.)  A computerized tomography (CT) scan of Nix's cervical spine revealed a complex unstable fracture at C1, abnormal soft tissue density extending from C1 to C3 posterolaterally that displaced the spinal cord to the left, and mild and lower cervical degenerative changes with possibly significant stenosis of the spinal canal at C6-C7. (AR 245.)  Dr. Badshah transferred Nix to the Northwest Texas Hospital, where Nix reported low back and neck pain.  (AR 178-185, 235.)  The examining physician diagnosed Nix with a stable C1 fracture and L2-3 transverse process fracture and discharged Nix the next day with a neck collar.[1] (AR 178, 183, 185.)

Nix received follow-up treatment at Quay County Medical Clinic from April 9 to July 17, 2007.  (AR 198-208.)  Nix reported back and neck pain at a level of five to seven out of ten and was prescribed a soft neck collar and pain medication.  (AR 198-200, 207-08.)  A cervical x-ray on May 7, 2007 found that Nix had degenerative changes in the lower cervical spine and interspace narrowing and spurring at C5-6 and C6-7.  (AR 201.)  Nix's fracture was reported as "well healed"

---

[1] Although Nix's April 2, 2007 car accident appears to have precipitated most of Nix's troubles with neck and back pain, the record also contains radiology reports dated February 3, 2006 which determined that Nix had mild degenerative changes in the thoracic spine.  (AR 257-61.)  The record indicates that Nix was involved in another car accident in 2006, which may have preceded these radiology reports.  (AR 470.) Medical records further indicate that Nix first experienced trouble breathing after his 2006 car accident.  (AR 470.)

on May 15, 2007 and he was referred to physical therapy (AR 199), but there are no indications in the record that Nix subsequently sought physical therapy.  While at Quay County Medical Clinic, Nix reported that he was still drinking but trying to quit and he was encouraged to join Alcoholics Anonymous.  (AR 198, 208.)

On June 4, 2007, Nix was taken back to Dan Trigg Hospital after he was found by police running in front of a train and exclaiming that he wanted to die.  (AR 220.)  Nix fled from police before his capture and  reported chest pain and coughing at the hospital.  (AR 225.)  A chest x-ray showed a normal sized heart, intact bones, no active lesions and clear lungs, but found chronic changes in the perihilar regions in the lung bases.  (AR 227.)  A psychiatrist at Mesa Counseling, Susan Lewis, M.D., diagnosed Nix as suicidal and recommended that he be immediately transported to Las Vegas Medical Center for evaluation of suicidal ideation and a strong intent to end his life. (AR 220-21.)  Dr. Lewis also considered Nix's car accident on April 2, 2007 to be a suicide attempt, which led her to conclude that Nix had attempted suicide twice in two months.  (AR 220.)  However, the record does not indicate that Nix was transferred to Las Vegas Medical Center or elsewhere after his June 4, 2007 suicide attempt.

On July 6, 2007, Nix returned to the emergency room at Dan Trigg Hospital with complaints of neck and chest pain.  (AR 215-219.)  Nix was assessed as having neck muscle strain and prescribed Flexeril.  (AR 217-18.)  On July 17, 2007, Nix returned to Quay County Medical Clinic with complaints of neck pain and painful breathing.  (AR 198.)  Nix was assessed as having "probable COPD," prescribed medication, and instructed again to join Alcoholics Anonymous due to his chronic alcohol abuse.  (AR 198.)

The record does not include any further medical records until March 18, 2008, when Nix visited his primary care physician, Mark Reininga, M.D., with complaints of neck pain at a pain

intensity level of eight out of ten.  (AR 369-370.)  The records indicate that Dr. Reininga discussed Nix's time at Quay County Medical Clinic and with Dr. Lewis, in addition to Nix's history of COPD and an unstable neck fracture.  (AR 369.)  Dr. Reininga ordered a magnetic resonance imaging (MRI) of Nix's cervical spine, which on March 18, 2008 revealed: (1) moderate to prominent degenerative disk disease (DDD) throughout the cervical region, greatest at C5 and C6 interspace levels; (2) moderate to prominent cervical spondylosis; (3) a mild broad disk bulge at C5-6 mildly impinging the cervical cord, with mild to prominent right and moderate left foraminal narrowing; (4) a mild herniated disc at C6-7 mildly impinging the cord with mild to moderate bilateral foraminal narrowing; (5) a central and left-sided disc bulge at C4-5 without cord impingement but with mild bilateral foraminal narrowing; (6) a central disc protrusion at C3-4 without cord impingement but with mild left foraminal narrowing; and (7) mild disc bulges at C2-3 and C7-T1. (AR 212-13, 367-68, 416-17.)

Dr. Reininga reviewed these MRI results and discussed them with Nix at a follow-up appointment on April 1, 2008.  (AR 366.)  At this time, Nix reported neck pain intensity at nine out of ten.  (AR 366.)  Nix saw Dr. Reininga again on April 15, 2008, at which time the doctor observed diminished cervical motion and prescribed Lortab and Ambien.  (AR 364.)  On May 8, 2008, Nix was treated at St. Vincent Hospital Emergency Department for abdominal pain, vomiting, and COPD exacerbation.  (AR 392-413.)  The records for this treatment note Nix's history of neck pain and alcohol abuse.  (AR 392, 395-96.)  Nix returned to Dr. Reininga again on May 13, 2008, at which time the doctor noted Nix's "COPD acute exacerbation" over the previous weekend.  (AR 362.)  On June 5, 2008, a CT scan of Nix's cervical spine ordered by Dr. Reininga showed multilevel degenerative changes with disc interspace narrowing at C5-7 and C3-4 as well as spinal

canal narrowing at C5-6 and C6-7 with posterior spurring, particularly on the right side.  (AR 358-60.)

On May 8, 2008, Michael Gzaskow, M.D., reported the results of a Mental Status Consultative Examination he conducted for Disability Determination Services (DDS).  (AR 264-268.)  Nix told Dr. Gzaskow that while he used to drink heavily, he stopped in 1999 when he was told he might have liver disease.  (AR 266.)  Nix indicated that he was now "under complete control" and had been clean and sober for four years, though he also admitted that he took one shot of whiskey daily.  (AR 266.)  Dr. Gzaskow diagnosed Nix with depressive disorder not otherwise specified, general anxiety disorder not otherwise specified, and a mood disorder secondary to Nix's general medical conditions.  (AR 267-68.)  Dr. Gzaskow found that Nix had general intellectual functioning and a general fund of knowledge at a "low average" level.  (AR 267.)  He also found that Nix had depressive ideation highlighted by feelings of inadequacy, hopelessness and helplessness, with episodic thoughts of suicide but no suicidal plan.  (AR 265, 267.)  Based on his examination, Dr. Gzaskow concluded that Nix had a difficult time relating to others based on his chronic pain syndrome, depression, and anxiety, but could understand and follow directions in a structured/supportive environment and attend to simple tasks.  (AR 268.)

On June 12, 2008, Martin Trujillo, M.D., reported the results of an Internal Medicine Consultative Examination he conducted for DDS.  (AR 269-271.)  Nix told Dr. Trujillo that he smoked half a pack of cigarettes a day and drank a fifth of alcohol per week, but admitted "to recent use of up to a half a gallon of liquor per day."  (AR 270.)  Nix also said that he had difficulty swallowing, pain with head rotation, back pain while bending, and headaches.  (AR 269.)  Dr. Trujillo diagnosed Nix with alcoholism, possible hypertension, COPD secondary to tobacco abuse, a history of low back pain, tension headaches, and paracervical pain with history of unstable C1 fracture and spinal subdural hematoma.  (AR 271.)  Dr. Trujillo also wrote that:

7

> Any estimation of functional capacity should be delayed until the current neurosurgical evaluation is completed. Those records need review. Hopefully, no significant neurological deficits will be found as he is a poor surgical candidate. There appears to [be] no limitations for light to moderate duty.

(AR 271.)

On June 12, 2008, Nix saw orthopedist Douglas Slaughter, M.D., for a spinal consultation. (AR 272-274.)  Nix indicated that he had no significant symptoms in his lower extremities but said that he had been suffering constant sharp pains in his head and neck since he removed his neck collar after his car accident.  (AR 272.)  Through a physical examination, Dr. Slaughter found that Nix had a normal gait, spinal balance, and lateral bending and rotation, but that Nix had decreased extension with pain in the cervical spine.  (AR 273.)  Dr. Slaughter also found that Nix had tenderness to palpitation "in the midline of the cervical spine and in the paraspinal muscles from C7 all the way up to the occiput."  (AR 273.)

Dr. Slaughter wrote that the March 18, 2008 MRI and June 5, 2008 CT scan of Nix's cervical spine showed: (1) spondlyosis, disc degeneration, and disc space narrowing throughout the cervical spine; (2) a healed fracture at C1-2 with right-sided joint involvement; (3) facet and joint arthropathy from C3-7; and (4) spine canal narrowing and "moderate to severe" foraminal stenosis at C5-7.  (AR 274.)  As a result, the doctor assessed Nix as having cervical spondylosis without myelopahy, cervical disc degeneration, and cervical stenosis.  (AR 274.)  Dr. Slaughter concluded that Nix had cervical arthritis throughout his entire cervical spine and that "[s]urgery is not the best option for a patient with this much cervical degeneration."  (AR 274.)  Instead, Dr. Slaughter recommended that Nix be treated with injections and possibly radiofrequency ablation to manage his pain.  (AR 274.)  However, Dr. Slaughter indicated that decompression at C5-7 should be considered if Nix started to develop upper extremity symptoms.  (AR 274.)  Dr. Slaughter's evaluation was sent to Dr.

8

Reininga (AR 272) and discussed at follow-up appointments with Dr. Reininga on June 10, 2008 and July 11, 2008.  (AR 356-57.)

On August 20, 2008, Nix first saw Dr. Paul Fullerton at Santa Fe Pain and Spine Specialists for evaluation and treatment of his cervical pain after being referred by Dr. Reininga.  (AR 316.) Nix reported pain primarily in the upper portion of the cervical spine with radiation into the occiput and temporal regions.  (AR 316.)  Nix also reported some upper extremity dysphagia, numbness, and a minor tremor.  (AR 316.)  Dr. Fullerton found that Nix's neck demonstrated significantly decreased range of motion in rotation and extension.  (AR 316.)  Nix saw Dr. Reininga again on September 5, 2008 and reported neck and stomach pain at nine out of ten, swelling hands and feet, diarrhea and cramping, and upcoming nerve block injections with Dr. Fullerton.  (AR 354.)

On September 22, 2008, Dr. Fullerton administered a trial of intra-articular facet injections into Nix at C2-6.  (AR 315.)  Before the injections, Nix reported lower back pain and persistent right neck pain which was translating into headaches on the right side.  (AR 315.)  At a follow-up appointment with Dr. Fullerton on October 28, 2008, Nix indicated that he had an excellent immediate response to the injections but that his symptoms returned five or six days later.  (AR 314.)  Nix reported that he had pain on the right side of his neck that was exacerbated by rotating to the right and side-bending to the right.  (AR 314.)  Nix also reported some pain in the trapezius and right shoulder but no symptoms radiating into the upper extremities.  (AR 314.)  Dr. Fullerton recommended a medial branch block trial, which was performed on November 25, 2008.  (AR 312-14.)  Before the procedure, Nix reported that he had started using oxygen at night and still had significant right-sided neck pain that was exacerbated by movement.  (AR 312.)

On November 6, 2008, Nix first saw Vanessa Kitzis, M.D., of Santa Fe Pulmonary and Critical Care.  (AR 322, 470-71.)  Nix reported that he had been experiencing shortness of breath

since his car accident in April of 2007.  (AR 470.)  Nix also reported that he had lower rib pain while breathing, severe neck pain, and constant headaches and exhaustion.  (AR 470.)  Nix stated that he had not smoked cigarettes in the past month and that his alcohol use had "decreased significantly."  (AR 470.)  Through a physical examination, Dr. Kitzis found that Nix had oxygen saturation of 89-90% on room air at rest and 80-83% on room air with exertion.  (AR 471.)  Dr. Kitzis assessed Nix as having probable COPD and hypoxemia "probably secondary to severe COPD."  (AR 471.)  Dr. Kitzis prescribed Spiriva, Advair, Nexium, Ambien, oxygen at night and for when Nix was under exertion, oximetry and sleep studies, pulmonary function tests, a chest x-ray, and possible pulmonary rehabilitation.  (AR 471.)

During this period, Nix continued to see Dr. Reininga at regular appointments.  Dr. Reininga received the findings of Dr. Fullerton and Dr. Kitzis and discussed them with Nix.  (AR 314, 349, 354, 470-71.)  On October 17, 2008, Nix reported neck, head, feet and hand pain at an intensity level of nine out of ten and Dr. Reininga prescribed Albuterol and Advair.  (AR 351.)  On October 21, 2008, through Dr. Reininga's referral, Nix underwent an ultrasound of the right upper quadrant of his abdomen that produced normal results.  (AR 350.)  On November 11, 2008, Dr. Reininga found that Nix had an oxygen saturation level of 91% on room air and diagnosed Nix with COPD.  (AR 349.)  On November 21, 2008, Dr. Reininga assessed Nix with metabolic syndrome after summarizing recent lab findings showing elevated liver enzymes, cholesterol, and HgbA1C.  (AR 341.)  On December 9, 2008, Nix reported neck and lower back pain at seven out of ten and Dr. Reininga prescribed Oxycodone and Temazepam.  (AR 340, 468.)

Pulmonary function tests in November of 2008 determined that Nix had a mildly decreased single breath diffusing capacity and a nonspecific ventilator abnormality with air trapping.  (AR 324-336.)  Reviewing these results, Dr. Kitzis found that they presented no evidence of obstruction

to account for the severity of Nix's hypoxemia and shortness of breath.  (AR 321.)  Dr. Kitzis noted Nix's elevated liver enzymes, diabetes, and high cholesterol.  (AR 321.)  On January 8, 2009, Nix returned to Santa Fe Pulmonary with complaints of daytime sleepiness.  (AR 474.)  A physical examination determined that Nix had oxygen saturation levels of 91% and 93%.  (AR 474.)  Nix was assessed for COPD, nicotine addiction, daytime sleepiness, and dyspnea and hypoxia requiring 24-hour oxygen.  (AR 474.)  However, a sleep study conducted on February 5, 2009 found generally well maintained oxygen and no evidence for sleep disordered breathing.  (AR 373-74, 474.)  Nix also underwent an echocardiogram on January 13, 2009 that revealed no significant abnormalities. (AR 377-78, 431-32, 474.)

On February 3, 2009, Nix returned to Dr. Fullerton and reported that his medial branch block trial, performed on November 25, 2008, had produced a good response.  (AR 449.)  Nix then underwent radiofrequency ablation and right-sided medial branches.  (AR 449-50.)  On March 16, 2009, Nix followed up with Dr. Fullerton and reported that the procedure had reduced both the frequency and intensity of his headaches.  (AR 448.)  However, Nix reported that he still had upper dorsal pain and that the pain radiating toward his shoulders had not changed.  (AR 448.)  Dr. Fullerton nonetheless wrote that Nix appeared to have had a successful result with the radiofrequency procedure and indicated that he would see Nix "as needed" in the future.  (AR 448.)  This report was sent to Dr. Reininga.  (AR 448.)

On March 10, 2009, Nix was admitted to St. Vincent Hospital with severe chest pain, left knee pain, and increased shortness of breath following a nine-hour car trip to Arizona.  (AR 422-430.)  Nix reported that he was continuing to smoke half a pay of cigarettes a day and still drank alcohol, with occasional binge drinking.  (AR 428.)  A CT pulmonary angiogram found two right middle and left lower pulmonary emboli with possible pulmonary infarct.  (AR 422, 429, 437.)  An

11

echocardiogram showed pulmonary hypertension of unknown severity.  (AR 425-26.)  Nix was admitted with assessments of pulmonary emboli with possible pulmonary infarction, COPD, hypertension, diet controlled diabetes, history of rectal bleeding, history of chronic pain, and deep venous thrombosis prophylaxis.  (AR 429-30.)  However, Nix improved rapidly after being given medication while hospitalized and was discharged on March 15, 2009.  (AR 422-23.)  Nix was given Lovenoz and Coumadin for his pulmonary emboli, MS Contin, Percocet, Roxanol and Morphine for chronic pain, and Avelox and nebulizer medications for COPD.  (AR 422, 429-30.)  A bilateral lower extremity venous duplex on April 11, 2009 found no evidence of superficial or deep venous thrombosis.  (AR 421.)  All of these records were sent to Dr. Reininga.  (AR 421-430.)

An echocardiogram dated May 12, 2009 found a mildly enlarged right atrium, mild sclerosis of the mitral valve without evidence of stenosis or insufficiency, mild regurgitation of the tricuspid valve, and moderate pulmonary artery hypertension.  (AR 419-420.)  On May 15, 2009, Nix returned to Santa Fe Pulmonary and was assessed as having COPD with a pulmonary embolism in March 2009 and pulmonary hypertension.  (AR 473.)  Nix was told to continue taking oxygen but reported in a follow-up appointment on August 17, 2009 that he had stopped because the oxygen tanks were too heavy for him to carry.  (AR 472.)  On August 25, 2009, Nix returned to St. Vincent Hospital for a CT angiogram of his chest.  (AR 459.)  The angiogram found resolution of the previously seen pulmonary emboli and concluded that there was "no sign of chronic emboli."  (AR 459.)  However, the radiologist also found that Nix's bone windows demonstrated DDD.  (AR 459.)

Nix continued to see Dr. Reininga once per month from December of 2008 through October of 2009.  (AR 461-68, 483-86.)  Nix reported pain at his neck, lower back, legs, arms, right foot, shoulders, and "all over" his body at an intensity level of seven to ten.  (AR 461-68, 483-86.)  Dr. Reininga prescribed medications including Oxycodone, MS Contin, and Trazadone.  (AR 461-68,

483-86.)  On April 3, 2009, Dr. Reininga discussed the records from Nix's March 2009 stay at St.

Vincent Hospital.  (AR 465.)  On July 24, 2009, Dr. Reininga noted that Nix's neighbor had called

in to report that Nix was intoxicated and trying to sell his medication pills.  (AR 461.)  However,

Dr. Reininga wrote that Nix's subsequent denial "seems truthful" and he continued to prescribe

medication.  (AR 461.)  August 2009 lab results ordered by Dr. Reininga showed elevated levels of

glucose, HgbA1C, liver enzymes, cholesterol, and uric acid.  (AR 487-90.)  On August 23, 2009,

a lumbar spine MRI ordered by Dr. Reininga revealed mild degenerative changes at L1-2 and L3-4,

mild disc space narrowing at L3-4 and L5-S1, a broad disk bulge with slight protrusion and bilateral

foraminal narrowing at L5-S1, abutment of the exiting L5 nerve roots, mild asymmetric compromise

of the left lateral recess at L4-5 due to disk with abutment of the exiting left L4 nerve root, and mild

broad disc and foraminal narrowing at L3-4 indenting the thecal sac.  (AR 454-56.)  On September

10, 2009, Dr. Reininga noted that Nix's August 25, 2009 CT angiogram had found Nix's pulomnary

emboli to be "resolved."  (AR 485.)

Nix's last visit to Dr. Reininga as reflected in the record occurred on October 12, 2009.  (AR

484.)  On October 13, 2009, Dr. Reininga completed a form entitled Medical Source Statement of

Ability to Do Work-Related Activities (Physical) at Nix's request.  (AR 478-481.)  Dr. Reininga

concluded that Nix: (1) could occasionally lift and carry less than ten pounds; (2) could stand and

walk less than two hours in an eight-hour workday and would need to sit or lie down every thirty

minutes; (3) must periodically alternate sitting and standing to relieve pain or discomfort; (4) would

have limited abilities in both the upper and lower extremities to push and pull due to neck, back, and

leg pain and weakness; (5) could balance and occasionally climb ramps, stairs, ladders, and

scaffolds, but never  kneel, crouch, crawl, stoop, or climb ropes due to chronic neck and back pain;

(6) could occasionally reach in all directions and handle objects if strength were required; (7) could

frequently finger and feel objects; (8) could see, hear and speak without limitation; but (9) would be limited in his ability to tolerate temperature extremes, noise, dust, humidity, hazardous machinery, and fumes, odors, chemicals and gases due to "severe COPD" and diminished oxygen saturation levels.  (AR 478-81.)

On October 13, 2009, Nix also saw orthopedist Jose R. Reyna, M.D., on Dr. Reininga's referral for treatment of neck and back pain.  (AR 491-93.)  Nix reported that his back pain extended into his lower extremities, the left more than the right, and reached his posterior thighs, posterior leg, and dorsal foot.  (AR 491.)  Nix also reported that his neck pain caused headaches and extended into his arms and fingers.  (AR 491.)  All of this pain was accompanied by numbness and tingling.  (AR 491.)  Nix reported that although the cervical injections he received from Dr. Fullerton had initially helped with his back pain, it was only a temporary improvement and Nix could not think of anything that had significantly reduced his neck pain and upper extremity pain.  (AR 491.)  Nix stated that he felt his symptoms were growing worse.  (AR 491.)

Upon physical examination, Dr. Reyna found that Nix had a normal gait and muscle strength but a significantly decreased range of motion in both the lumbar and cervical spine.  (AR 491-92.)  Dr. Reyna noted that Nix did not have past spinal surgeries or physical therapy.  (AR 491.)  Dr. Reyna characterized Nix's August 23, 2009 MRI as showing L5-S1 moderate to severe facet degenerative joint disease, plain films of his lumbar spine as showing L3-4 grade I retrolisthesis with L3-4 decreased disc space height, plain films of his cervical spine as showing right C1-2 facet degenerative joint disease as well as degenerative disc disease at C5-6 and C6-7, and Nix's June 6, 2008 CT scan of his cervical spine as showing right C1-2 severe facet degenerative joint disease.  (AR 492.)

Dr. Reyna concluded that Nix's L5-S1 facet joints were the most likely source for his lumbar spine pain and referred Nix to Dr. Fullerton for bilateral L5-S1 facet joint injections. (AR 492.) For Nix's neck pain, Dr. Reyna found that the "most likely" source was right C1-2 facet degenerative joint disease. (AR 493.) Dr. Reyna wrote that "[a]t this point I would not recommend surgical intervention because this would require a C1-2 fusion. [Nix] would lose 50% of lateral rotation in either direction with this type of procedure." (AR 493.) Dr. Reyna suggested that Nix could be considered for a referral to physical therapy at his next appointment and that physical therapy may help with both his cervical and lumbar pain. (AR 493.)

In addition to the foregoing, the record before the ALJ included several additional assessments of Nix's physical and mental RFC by DDS reviewing physicians. However, the ALJ explained that his RFC determination was "in no way based" on these opinions because of various deficiencies. (AR 24.) On June 27, 2008, DDS reviewing physician N. Nickerson opined that Nix could frequently lift 10 pounds, occasionally lift 20 pounds, and stand, walk, and sit for 6 hours in an 8-hour workday. (AR 293-300.) On August 3, 2008, DDS reviewing physician J. Pataki assessed Nix with the same limitations except that he concluded Nix could only occasionally balance, stoop, kneel, crouch, and crawl. (AR 300-308.) The initial RFC assessments of Dr. Nickerson and Dr. Pataki were affirmed by DDS reviewing physician Janice Kondo on April 4, 2009. (AR 262.) On June 20, 2008, DDS reviewing physician Elizabeth Chiang completed a Psychiatric Review Technique Form (PRTF) and mental RFC assessment. (AR 279-92.) Dr. Chiang assessed Nix as having depression not otherwise specified, a mood disorder not otherwise specified, generalized anxiety disorder, and substance addiction disorders. (AR 282, 284, 287.) Dr. Chiang further determined that Nix was moderately to mildly limited in his abilities to conduct daily living activities, to understand, remember and carry out detailed instructions, to maintain attention and

concentration for extended periods, to maintain social functioning, concentration and persistence, to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting, and to engage in episodes of decompensation of extended duration. (AR 275-76, 289.) Dr. Chiang's PRTF and mental RFC assessment were affirmed by another DDS reviewing physician on April 24, 2009. (AR 263.)

The foregoing is the evidence in the record that was before the ALJ. However, soon before and after the ALJ's decision Nix began to see Dr. Marcellin L. Simard for treatment of his breathing problems. (AR 521-32.) Nix's records with Dr. Simard were submitted to the Appeals Council along with his Request for Review of the ALJ's unfavorable decision and are part of the record for purposes of my review.[2] *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). On October 7, 2009, Nix first visited Dr. Simard for a cardiology consultation and complained of dyspnea on exertion with minimal activity. (AR 525.) Nix reported that he was using oxygen "24/7" and drinking one fifth of whiskey a week. (AR 525-26.) Dr. Simard found that Nix had oxygen saturation of 92% on room air and decreased breathing sounds in his lungs. (AR 525.) Dr. Simard assessed Nix as having: (1) "severe COPD with severe dyspnea on exertion" and a history of left deep venous thrombosis and pulmonary emboli; (2) occasional mild dizziness; (3) hyperlipidemia; and (4) "24/7" usage of oxygen. (AR 526.) Simard recommended a right heart catheterization and Norvasc for high blood and pulmonary pressure. (AR 526.)

---

[2] The Appeals Council stated that it considered new medical records Nix had submitted (AR 6) and the Commissioner has not disputed that Dr. Simard's records were new, material, and related to the period on or before the date of the ALJ's decision. *See Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). As a result, these materials are part of the record for purposes of my review of the ALJ's decision. *Id.*

Catheterization at St. Vincent Hospital revealed mild pulmonary hypertension that was responsive to oxygen and Nipride.  (AR 524, 527-28.)  However, on November 5, 2009 Nix reported occasional shortness of breath and chest pain.  Dr. Simard prescribed Bystolic.  (AR 524.)  On December 22, 2009, Nix reported that although he still had shortness of breath with mild exertion, he had more energy and his breathing had improved since he started taking Bystolic.  (AR 522.)  Dr. Simard measured Nix's oxygen saturation at 94% on room air, increased Nix's dosage of Norvasc, and planned to work next to rule out possible coronary artery disease.  (AR 522-23.)

### HEARING TESTIMONY

Nix appeared before the ALJ on October 29, 2009 and testified about his physical limitations.  (AR 535-550.)  Nix testified that he was unable to work due to chronic neck pain, arthritis and DDD in his back, and breathing problems.  (AR 537-38, 542.)  Nix alleged that his neck and back pain collectively make it difficult to bend down and reach in any direction for objects, prevent Nix from sitting comfortably for more than ten minutes, produce intermittent numbness and aches in his hands and arms, prevent Nix from lifting ten pounds and cause him to drop objects that he tries to hold in front of himself, produce migraine headaches, and prevent Nix from walking around a grocery store for longer than fifteen to twenty minutes without needing to sit down.  (AR 537-39, 542-44.)  Nix testified that while his neck pain "comes and goes," his back pain is constantly present and is regarded by Dr. Reininga as his most serious problem.  (AR 542-43.)  Nix alleged that, on average, his back pain has a pain intensity level of nine out of ten.  (AR 543.)

Regarding his breathing problems, Nix testified that he struggles to breathe while walking and becomes out of breath after climbing one flight of stairs or walking one block.  (AR 542.)  Nix stated that his breathing problems have continued even though his pulmonary embolism went away. (AR 545.)  Nix also stated that he constantly uses oxygen tanks for breathing except for when he is

away from his home, because his fifteen-pound oxygen tanks strain his neck and shoulders and produce headaches.  (AR 545-546.)  Nix said that he lives on the first floor of an apartment complex for senior citizens and disabled people with a female roommate and spends most of his time "just sitting in the front room watching TV, or if my back pain gets too bad then I go lay down for a couple hours."  (AR 538-39.)  However, Nix also said that he occasionally goes shopping at grocery stores.  (AR 539.)

In addition to Nix's DDD and breathing problems, the ALJ questioned Nix about his alcohol and tobacco use and his prior work experience.  Nix admitted that he was "drinking real heavy" in 1999 and had been drinking before his April 2, 2007 car accident, but testified that he had "hardly drank at all" over the eight months prior to the hearing.  (AR 539-540.)  Nix alleged that the only alcohol he had consumed over the past eight months was "a beer or two" while watching football on Sundays.  (AR 540, 544.)  Nix also alleged that his tobacco use had decreased from two packs per day to five cigarettes per day over the previous eight months.  (AR 541.)  Nix testified that before his disabilities began, he had worked as a tire changer, bus refabricator, and, most recently, as a "prep cook."[3]  (AR 536-37.)  Nix claimed that his easiest occupation had been as a prep cook but that he could no longer perform the job because it required a lot of standing and lifting of heavy objects.  (AR 546.)

On the ALJ's request, vocational expert (VE) Jerry Taylor also testified at the hearing.  (AR 550.)  The ALJ asked the VE if an individual with Nix's age, education and work history could perform any jobs in the national economy if the individual: (1) could not constantly use his hands; (2) was limited to light and non-complex work; (3) needed to sit or stand at his option; (4) could not

---

[3] Medical records indicate that Nix worked as a prep cook until his car accident on April 2, 2007. (AR 273.)

climb, crawl, kneel, squat, or work overhead with his arms; and (5) needed to work in an environment that was climate-controlled and free of dust, fumes, and chemicals. (AR 546-47.) The VE answered that such an individual could still perform work as a bakery line worker, a photograph finisher, and a shipping and receiving weigher. (AR 547.) The VE provided the corresponding numbers in the Dictionary of Occupational Titles (DOT) for each of these jobs. (AR 547.) Upon questioning by Nix's counsel, the VE clarified that while the DOT generally classifies light work as requiring a worker to be able to stand for six hours, all three of the jobs he proposed would allow a worker to sit or stand at will. (AR 548-49.) The VE also told Nix's counsel that the jobs were "simple . . . one, two step jobs" and would not involve working with the public. (AR 550.)

## ALJ DECISION AND APPEALS COUNCIL DECISION

In a written decision dated February 17, 2010, the ALJ determined that Nix had not engaged in substantial gainful activity since April 2, 2007. (AR 14.) The ALJ found that Nix's diagnosed diabetes mellitus, hypertension, gout, history of pulmonary embolism, depression and anxiety did not constitute "severe" impairments under the Social Security Act. (AR 20-21.) The ALJ did find that Nix had "technically severe" impairments of DDD, COPD and alcohol abuse, but concluded that Nix did not have an impairment or combination of impairments that were listed in or equal to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 15-21.) The ALJ further found that Nix had underlying medically determinable impairments that could reasonably cause some of his alleged symptoms, but concluded that the evidence as a whole showed that Nix had "exaggerated both the nature and the severity of his subjective complaints." (AR 21-23.) As a result, the ALJ determined that Nix's testimony was "not the least bit credible" to the extent that he alleged his complete inability to sustain any form of work activity at all. (AR 23 (citing 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p).)

At step four of the sequential evaluation process, the ALJ found that:

> The claimant has the residual functional capacity to perform, on a continuing and sustained basis, the exertional and nonexertional requirements of light work activity[4] as follows: which affords the opportunity to alternate between sitting and standing at the worker's option; which does not entail climbing, crawling, kneeling, squatting or working overhead with the arms; which is performed in a dust-, fume- and chemical-free environment which is claimant-controlled [sic]; which does not entail constant use of the hands; and which is limited to non-complex work.

(AR 23.)  The ALJ stated that Nix had the capacity to perform work consistent with this RFC assessment "despite his subjective complaints."  (AR 23.)  The ALJ explained that he considered: (1) Nix's alcohol abuse and "clear preoccupation with the perception of pain" in limiting Nix to non-complex work; (2) Nix's COPD in limiting Nix to a climate-controlled "clean" work environment; and (3) Nix's complaints of chronic musculoskeletal pain in limiting Nix to light work with the freedom to alternate between sitting and standing and without most postural maneuvers.  (AR 23-24.)

The ALJ stressed that his RFC determination was "in no way based" on the assessments of Dr. Nickerson, Dr. Pataki, and Dr. Chiang because those opinions "did not provide a rationale and findings of fact, were rendered without the benefit of personally observing the claimant and reviewing all of the pertinent medical reports, and were wholly conclusory and unsupported."  (AR 24 (citing SSR 96-6p).)  Conversely, the ALJ stated that he did consider the conclusions of the consultative examiners[5] and Dr. Reininga in reaching his RFC assessment, but found no objective

---

[4] The ALJ clarified that "[l]ight work activity involves the lifting of no more than 20 pounds at a time with the frequent lifting of up to 10 pounds, and standing and walking, off an on, for a total of 6 hours out of an 8-hour workday.  (AR at 23 (citing 20 C.F.R. §§ 404.1567(d), 416.967(b), SSR 83-10).)

[5] These physicians were Dr. Gzaskow and Dr. Trujillo.  Earlier, the ALJ twice noted Dr. Gzaskow's opinion that Nix could perform "simple" work and twice referenced Dr. Trujillo's examination as finding that Nix had "no limitations for light to moderate duty."  (AR 16, 23.)

support for some aspects of Dr. Reininga's RFC assessment.  (AR 24.)  The ALJ explained that he afforded only "little weight" to Dr. Reininga's RFC assessment as a treating source opinion because: (1) Dr. Reininga had based his opinion regarding Nix's ability to perform work-related activities "almost exclusively on the claimant's subjective complaints and self-report of his functional limitations"; (2) the record did not indicate that Dr. Reininga had recorded objectively observed abnormalities, functional limitations, or even performed many physical examinations; and (3) Dr. Reininga had "apparently" not reviewed the objective findings of other physicians who had studied the results of diagnostic testing and actually examined Nix, which uniformly reported that Nix was not significantly limited despite his subjective complaints and his diagnosed impairments.  (AR 20.) However, the ALJ also found that Nix was unable to perform his past relevant work under the ALJ's RFC determination.  (AR 24.)  Due to that finding, Nix established a prima facie case of disability and the burden shifted to the Commissioner to show that Nix could presently perform other jobs existing in significant numbers in the national economy.  (AR 24); *see also Williams*, 844 F.2d at 751.

Applying his RFC assessment, the ALJ concluded that Nix was not disabled under step five of the sequential evaluation process because he could still perform work as a bakery line worker, photograph finisher, or shipping and receiving weigher despite his impairments.  (AR 25.)  In reaching this conclusion, the ALJ accepted the testimony of the VE and concluded that all three jobs existed in significant numbers in the national economy.  (AR 25.)  As a result, the ALJ denied Nix's applications for Social Security Disability Insurance benefits and Supplemental Security Income. (AR 26.)

On July 29, 2010, the Appeals Council denied Nix's request to review the ALJ's decision. (AR 6-8.)  The Appeals Council stated that it had considered the new medical records Nix had submitted from Dr. Simard but nonetheless found no reason to review the ALJ's decision.  (AR 6.)

## ALJ's RFC Finding

Nix argues that I must remand this case because the ALJ's RFC finding at step four of the sequential evaluation process was not supported by substantial evidence and is legally erroneous. In support, Nix contends that: (1) the ALJ's finding regarding Nix's credibility was not supported by substantial evidence (Doc. 18 at 21-23, Doc. 20 at 4); (2) the ALJ mischaracterized the record and did not discuss significantly probative evidence that he rejected (Doc. 18 at 15-17; Doc. 20 at 1-2); and (3) the ALJ's decision to afford Dr. Reininga's RFC assessment "little" weight was not supported by substantial evidence and was legally erroneous (*id.* at 17-19; Doc. 20 at 2).  While I find that the ALJ omitted several pieces of relevant evidence and assigned weight to Dr. Reininga's RFC assessment in part due to improper speculation, I conclude that the ALJ's RFC determination as a whole is still supported by substantial evidence and met with proper legal standards.

### 1.  Credibility Determination

Nix argues that the ALJ's RFC determination is not supported by substantial evidence in part because the ALJ's finding regarding Nix's credibility was not supported by substantial evidence. Specifically, the ALJ found that:

> The claimant has underlying medically determinable impairments which could reasonably cause some of the symptoms alleged; however, based on the evidence in its entirety, the claimant's testimony was not credible or reasonably supported by the objective medical evidence, or inferences therefrom, to the extent that he has alleged that he is completely unable to perform any work activity.

(AR 21.)

Judging credibility is "peculiarly the province" of the ALJ. *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002); *see also Adams v. Chater*, 93 F.3d 712, 715 (10th Cir. 1996) (citation and quotation marks omitted) ("Generally, credibility determinations are the province of the ALJ, the individual optimally positioned to observe and assess witness credibility.") If an ALJ determines that a claimant has an impairment that could reasonably be expected to produce the claimant's alleged disabling pain or symptoms, the ALJ must evaluate whether the claimant's subjective allegations of pain are substantiated by objective medical evidence. *Hamlin*, 365 F.3d at 1220; SSR 96-7p, 1996 WL 374186 at *2. Subjective allegations of pain cannot be disregarded simply because there is no objective corroboration of the pain's severity. *Hamlin*, 365 F.3d at 1220 (citing *Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987)). Instead, the ALJ must determine the credibility of a claimant's statements by considering:

> 1) [t]he individual's daily activities; 2) [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) [f]actors that precipitate and aggravate the symptoms; 4) [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* (quoting SSR 96-7p, 1996 WL 374186 at *3); *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Although the ALJ is not required to provide a "formalistic factor-by-factor recitation of the evidence," *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000), "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 392 (10th Cir. 1995) (citation omitted). However, "the [ALJ] need not totally accept or totally reject the individual's statements." SSR 96-

7p, 1996 WL 374186 at *4.  The ALJ may instead find that only some of an individual's allegations are credible, or find that allegations are credible only "to a certain degree."  *Id.*

Here, the ALJ's evaluation of Nix's credibility was supported by substantial evidence and followed the proper legal standards.  After determining that Nix had impairments that could reasonably be expected to produce some of his alleged symptoms, the ALJ listed each of the required factors and linked them to specific findings.  (AR 22.)  Nix argues that the ALJ's credibility determination is "puzzling because it reads favorably to [Nix]" (Doc. 18 at 22),  but he overlooks the fact that the ALJ only found Nix to not be credible "to the extent that he has alleged that he is completely unable to perform any work activity."  (AR 21.)  The ALJ was permitted to find Nix credible only "to a certain degree," and Nix has pointed to no evidence in the record indicating that Nix was completely unable to work.  Even Dr. Reininga found, as the ALJ noted and Nix admits, that Nix had "an RFC for a limited range of sedentary work."  (AR at 23; Doc. 18 at 17 (citing AR 478-81).)

Nix claims that the ALJ failed to consider his "persistent attempts to find relief from his pain, his willingness to try various treatments for his pain, and his frequent contact with physicians concerning his pain-related complaints."  (Doc. 18 at 22-23 (quoting *Hardman v. Barnhart*, 362 F.3d 676, 680 (10th Cir. 2004).)  However, in *Hardman* an ALJ found that the claimant's allegations of pain were not fully credible in a "boilerplate paragraph" that "failed to link or connect any of the factors he recited to any evidence in the record."  *Id.* at 679.  As a result, the ALJ failed to mention various medication the claimant had been prescribed and incorrectly stated that the claimant had taken no medication for severe pain.  *Id.* at 679-80.  Here, however, the ALJ's discussion did link the relevant factors to evidence in the record and listed Nix's various prescribed medications, oxygen, and other treatment for pain.  (AR 22.)  The ALJ found that all prescribed treatment was

"reportedly effective without any evidence of significant unresolved side effects," which is a conclusion Nix has not challenged.  (AR 22.)  The ALJ's consideration of Nix's treatments for his pain and attempts to find relief from pain was sufficient to comply with *Hardman*.

Nix's final argument pertaining to the credibility determination concerns the ALJ's finding that Nix had "persistently provided false and conflicting information about his ongoing alcohol abuse to various treating and examining sources."  (AR 23.)  Nix admits that this finding was relevant to the ALJ's credibility determination and does not dispute that it is supported by substantial evidence in the record. (Doc. 19 at 23.)  Instead, Nix argues that the ALJ did not explain how Nix's false statements about alcohol abuse undermined the medical evidence of Nix's other impairments, and notes that Nix's false statements would regardless have been insufficient by themselves to undermine Nix's allegations of pain.  (*Id.* (citing *Hamlin*, 365 F.3d at 1222).)  Nix is correct on these points, but the ALJ did not find Nix's allegations of pain uncredible solely because he found that Nix made false statements about his alcohol abuse.  Instead, the ALJ made findings with regard to each relevant factor and, most importantly, concluded only that Nix was not credible to the extent that he alleged the complete inability to sustain any form of work activity.  (AR 22-23.)  Because this finding is supported by substantial evidence and the ALJ applied the proper legal standards, I find no error as to the ALJ's credibility determination.

### 2.  Mischaracterization of the Record and Omission of Probative Evidence

Nix next argues that the ALJ mischaracterized portions of the record and failed to consider other evidence altogether.  Collectively, these claims of error implicate the ALJ's legal duties to consider all relevant medical evidence in making his findings and to discuss significantly probative evidence that he rejects.  *Grogan*, 399 F.3d at 1262.  While I find that the ALJ did fail to discuss pieces of contrary evidence, I conclude that these errors did not undermine the ALJ's RFC

determination and that the ALJ's conclusions regarding the severity of Nix's impairments were still supported by substantial evidence.

Nix first contends that the ALJ distorted the medical record by characterizing Nix as having a history of "mild" degenerative changes in his spine.  (AR 15, 19.)  In support, Nix states that although the ALJ recited Dr. Slaughter's assessments and the results of his physical examination at Nix's June 12, 2008 appointment (AR 17), the ALJ failed to discuss Dr. Slaughter's notes regarding the March 18, 2008 MRI and June 5, 2008 CT scan of Nix's cervical spine.  Dr. Slaughter wrote that these images showed spondylosis, disc degeneration, and disc space narrowing throughout the cervical spine along with spine canal narrowing and "moderate to severe" foraminal stenosis at C5-7.  (AR 274.)  Nix states that the ALJ also failed to mention Dr. Reyna's assessment of Nix's June 5, 2008 cervical spine CT scan as showing right C1-2 severe facet degenerative joint disease, and his assessment of Nix's Nix's August 23, 2009 lumbar spine MRI as showing "L5-S1 moderate to severe facet disc degeneration disease."   (AR 492.)   Lastly, Nix argues that the ALJ mischaracterized Nix's August 23, 2009 lumbar MRI as showing "mild degenerative changes at multiple levels, only."  (AR 19.)

I find no error with respect to the ALJ's discussion of the medical evidence pertaining to Nix's lumbar spine.  The ALJ's description of Nix's August 23, 2009 lumbar MRI was not inconsistent with the results, which revealed mild degenerative changes at L1-2 and L3-4, mild disc space narrowing at L3-4 and L5-S1, a broad disk bulge with slight protrusion and bilateral foraminal narrowing at L5-S1, abutment of the exiting L5 nerve roots, mild asymmetric compromise of the left lateral recess at L4-5 due to disk with abutment of the exiting left L4 nerve root, and mild broad disc and foraminal narrowing at L3-4 indenting the thecal sac.  (AR 454-56.)  Nothing in these results indicated severe, as opposed to "mild," degenerative changes.  Additionally, contrary to

Nix's argument, the ALJ did mention that Dr. Reyna interpreted the August 23, 2009 lumbar MRI as showing "moderate to severe facet degeneration at L5-S1." (AR 19.)

With respect to Nix's cervical spine, I find that the ALJ erred in failing to address Dr. Slaughter's opinion that Nix had "moderate to severe" foraminal stenosis at C5-7 and Dr. Reyna's opinion that Nix had right C1-2 severe facet degenerative joint disease. (AR 274, 492.) This evidence was relevant and should have been addressed, but it was also overwhelmed by other medical evidence in the record. (*E.g.*, AR 254 (April 2, 2007 CT scan of Nix's cervical spine revealing mild cervical degenerative changes); AR 212-13 (March 18, 2008 MRI of Nix's cervical spine revealing moderate to prominent DDD throughout the cervical spine, moderate to prominent cervical spondylosis, and mild disc bulges at C2-3, C5-6, and C7-T1); AR 273 (June 12, 2008 physical examination by Dr. Slaughter finding that Nix had a normal gait, spinal balance, and lateral bending and rotation); AR 454-56 (August 23, 2009 lumbar MRI)). As a result, the ALJ's finding of overall "mild" degenerative changes was still supported by substantial evidence. *Lax*, 489 F.3d at 1084.

Nix next argues that the ALJ should have mentioned Dr. Slaughter and Dr. Reyna's conclusions that Nix would not be a good surgical candidate because of the extent of his cervical degeneration. (AR 274, 493.) In response, the Commissioner argues that it was not error for the ALJ to fail to address these opinions because the doctors also concluded that Nix's "pain could be managed with non-surgical treatment such as injections, radio-frequency ablations, and physical therapy." (Doc. 19 at 16, 20.) I find, however, that Dr. Slaugher and Dr. Reyna's records do not support this interpretation of their conclusions. Although the doctors did prescribe non-surgical treatments, there is no indication that they believed these treatments would effectively manage Nix's pain and remove the need for surgery. Rather, Dr. Slaughter opined that "[s]urgery is not the best

option for a patient with this much cervical degeneration," and he recommended that surgery be "[held] off" while he "[tried] to alleviate [Nix's] pain." (AR 274.) Similarly, after recommending against surgery because it would require a C1-2 fusion that would result in a 50% loss of lateral rotation, Dr. Reyna wrote only that "when [Nix] returns for follow-up, depending on his progress, he could be considered for a referral to physical therapy. This may help with both the cervical and the lumbar pain." (AR 493.) These statements do not show that the doctors believed nonsurgical treatment for Nix's pain would be effective; they merely indicate that other treatments were possible and would be pursued. Furthermore, even if these statements could be read as minimizing the importance of the fact that Nix's doctors believed he had too much cervical degeneration for surgery, the ALJ should have at least mentioned and evaluated the doctors' full conclusions in his decision. District courts cannot create "post-hoc rationalizations" to explain the ALJ's treatment of evidence when that treatment is not apparent from the decision itself. *Grogan*, 399 F.3d at 1263 (citations omitted).

While I find, then, that the ALJ erred in failing to note Dr. Slaughter and Dr. Reyna's opinions regarding Nix's surgical outlook, I cannot conclude that the ALJ's RFC determination is not supported by substantial evidence due to this omitted evidence. Nothing in the opinions inherently contradicts the ALJ's finding that Nix had only "mild" degenerative changes. Even more importantly, neither Dr. Slaughter nor Dr. Reyna ever assessed Nix as having any physical limitations in his ability to function in the workplace, including when they determined that he was a poor surgical candidate. Consequently, while Dr. Slaughter and Dr. Reyna's opinions were undoubtedly relevant, I do not find that their omission undermined the ALJ's RFC determination.

I reach a similar conclusion with respect to Nix's claim that the ALJ "minimized the severity of [Nix's] COPD." (Doc. 18 at 17.) It is undeniable that the ALJ failed to discuss all of the medical

28

evidence pertaining to Nix's COPD.  Although the ALJ did discuss Dr. Kitzis' findings at Nix's November 6, 2008 appointment, including oxygen saturation of 89-90% on room air at rest and 80-83% on room air with exertion (AR 17), he did not mention that Dr. Kitzis diagnosed Nix with "hypoxemia, probably secondary to severe COPD."  (AR 471.)  The ALJ also failed to mention that Dr. Reininga described Nix's COPD as "severe" in his RFC assessment.[6]  (AR 471, 481.)  However, the ALJ did expressly consider Nix's COPD when he determined Nix's RFC and he fully adopted the limitations assessed by Dr. Reininga in light of Nix's COPD.  (AR 24.)  Just as Dr. Reininga had done, the ALJ limited Nix to a climate-controlled "clean" environment due to his COPD.  (AR 24, 481.)  Nix argues that the ALJ should also have explained how he determined that an individual with diagnosed "severe" COPD and a prescription for 24-hour oxygen could stand and walk for six hours in an eight-hour workday (Doc. 18 at 17), but none of the doctors who diagnosed Nix with severe COPD assessed it as producing any limitations on Nix's abilities to stand and walk during a workday.[7]  The only limitation assessed as a result of Nix's COPD was Dr. Reininga's environmental limitation.  (AR 481.)  As a result, I find that the ALJ's error in omitting the full assessments of Nix's COPD did not have any impact on the ALJ's ultimate determination of Nix's RFC.[8]

---

[6] After the ALJ's decision, Dr. Simard also assessed Nix as having "severe COPD with severe dyspnea on exertion." (AR 526.) As previously noted, this evidence is part of the record for purposes of my review of the ALJ's decision.

[7] Dr. Kitzis in fact found that the results of Niz's pulmonary function tests in November of 2008 presented no evidence of obstruction to account for the severity of Nix's hypoxemia and shortness of breath. (AR 321.)

[8] For these same reasons I also find that the records submitted by Dr. Simard, who also diagnosed Nix with "severe" COPD but did not assess any functional limitations, did not undermine the ALJ's RFC determination.

Nix's final argument regarding mischaracterization of the record and omission of evidence pertains to the ALJ's discussion of the Internal Medicine Consultative Examination conducted by Dr. Trujillo for DDS.  The ALJ indicated that he had considered Dr. Trujillo's conclusions at his RFC determination and twice referenced Dr. Trujillo earlier in his decision as finding that Nix had "no limitations for light to moderate duty."  (AR 16, 23-24.)  Nix argues that this statement was taken out of context because Trujillo's conclusions were, in their entirety:

> Any estimation of functional capacity should be delayed until the current neurosurgical evaluation is completed.  Those records need review.  Hopefully, no significant neurological deficits will be found as he is a poor surgical candidate.  There appears to [be] no limitations for light to moderate duty.

(AR 271.)  Nix also argues that, to avoid error, the ALJ should have required Dr. Trujillo to submit a complete report because the Commissioner's regulations require a "complete consultative examination" to include an RFC assessment that describes, in addition to other information, the claimant's ability "to do work-related activities, such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling . . . ."  20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6).

I find that the ALJ did not err in referencing and giving weight to the last sentence of Dr. Trujillo's conclusions.  Although the regulations provide that the SSA will "ordinarily request, as part of the consultative examination process," a detailed statement describing the claimant's ability to do work-related activities, they also provide that "the absence of such a statement in a consultative examination report will not make the report incomplete."  20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6).  Nix has pointed to no law contradicting this point or holding that an ALJ cannot refer to a consultative examiner's report that did not include detailed statements of what a claimant can still do.  Consequently, the ALJ was not prohibited from giving weight to Dr.

Trujillo's conclusions even though they did not include an assessment of Nix's ability to sit, stand, walk, and perform other activities.

Regarding the ALJ's selective references to Dr. Trujillo's report, I agree with Nix that it would have been best if the ALJ quoted the full paragraph of Dr. Trujillo's conclusions.  In stating simply that Dr. Trujillo "concluded that the claimant had 'no limitations for light to moderate duty,'" the ALJ omitted the fact that Dr. Trujillo also wanted to wait to provide a full RFC assessment until Nix's "neurosurgical evaluation" was complete.[9]  Nonetheless, the sentence referenced by the ALJ was undeniably Dr. Trujillo's initial opinion and the conclusion he reached from his own examination.  The fact that Dr. Trujillo did not supplement his report later did not prohibit the ALJ from giving weight to the conclusions that the consultative examiner did provide.  As a result, I find that the ALJ did not mischaracterize the record in his treatment of Dr. Trujillo's report.

### 3.  Treatment of Dr. Reininga's RFC Assessment

In his final claim pertaining to the ALJ's RFC assessment, Nix argues that the ALJ's assignment of "only little weight" to Dr. Reininga's RFC assessment was not supported by substantial evidence and was legally erroneous.  Although I find that the ALJ discredited Dr. Reininga's opinion in part due to improper speculation, I conclude that the ALJ's treatment of Dr. Reininga's opinion as a whole was still supported by substantial evidence.

Because Dr. Reininga was one of Nix's treating physicians, his RFC opinion had to be assessed under specific guidelines set by regulation.  *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  When presented with a medical opinion from a treating physician,

---

[9] Dr. Trujillo appears to have been referring to the PRTF and mental RFC assessment completed by DDS reviewing physician Elizabeth Chiang on June 20, 2008.  (AR 279-92.)

the ALJ must first determine whether the opinion qualifies for controlling weight, which makes it "conclusive . . . on the matter to which it relates." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  To make this determination, the ALJ "must first determine whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  If the answer to this question is 'no,' then the inquiry at this stage is complete." *Watkins*, 350 F.3d at 1300.  If the answer is yes, the ALJ then determines whether the opinion is consistent with other substantial evidence in the record.  *Id.*; s*ee also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If this question is also answered in the affirmative, the treating physician opinion must be given controlling weight. But "if the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Watkins*, 350 F.3d at 1300.

However, "[e]ven if a treating physician's opinion is not entitled to controlling weight, 'treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 404.1527(d)(2)].'" *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1300).  These factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.*; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  At this second step of the analysis, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330 (citing *Watkins*, 350 F.3d at 1300-01.)  "In choosing to reject the treating physician's assessment, an ALJ may not make

speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *McGoffin*, 288 F.3d at 1252 (citation and emphasis omitted).

Here, the ALJ erred at both steps of his evaluation of Dr. Reininga's RFC assessment. At step one, he simply conducted no analysis at all and immediately evaluated Dr. Reininga's opinion under the factors for determining the weight of a non-controlling treating physician opinion. (AR 19-20.) Although I could remand because of this error, *e.g., Krauser*, 638 F.3d at 1330 (quotation marks omitted) (stating that "[t]he initial determination the ALJ must make with respect to a treating physician's medical opinion is whether it is . . . to be accorded controlling weight . . . ."), I choose not to because the ALJ's analysis by implication shows that he did not give controlling weight to Dr. Reininga's RFC assessment. The ALJ found at his step two analysis that Dr. Reininga's assessment was inconsistent with other substantial evidence in the record (AR 20), and this conclusion would also have disqualified Dr. Reininga's opinion from receiving controlling weight. *Watkins*, 350 F.3d at 1300. Although the ALJ should make express findings at both steps of analysis in the future, I will not remand solely for the ALJ to add a finding that is already clear from the record.

At step two of the analysis, the ALJ assigned "only little weight" to Dr. Reininga's RFC assessment after listing all of the factors in 20 C.F.R. § 404.1527(d)(2) and tying each factor to specific findings. The ALJ then summarized his analysis of Dr. Reininga and his medical opinion as follows:

> Viewing these factors, I conclude that the claimant's primary care physician has based the opinion as to the claimant's ability to perform work-related activities almost exclusively on the claimant's subjective complaints and self-report of his

functional limitations.  The record does not indicate that the doctor has recorded objectively observed abnormalities and/or functional limitations, or even that the doctor has performed many physical examinations.  Nor has this doctor apparently reviewed the objective findings of other physicians who have studied the results of diagnostic testing and actually examined the claimant, as these other physicians have uniformly reported that the claimant is not significantly limited despite his subjective complaints and his diagnosed impairments.  I have therefore afforded only little weight to this treating source opinion as to the claimant's residual functional capacity.

(AR 20.)

I agree with Nix that some of the ALJ's reasons for assigning little weight to Dr. Reininga's RFC assessment consisted of improper speculation and lay opinion that are contradicted by the record.  *McGoffin*, 288 F.3d at 1252.  Specifically, the record shows that Dr. Reininga was provided with many of Nix's outside medical records bearing on his COPD, neck, and back problems, which refutes the ALJ's findings that Dr. Reininga based his assessment "almost exclusively" on Nix's subjective complaints and did not review the objective findings of other physicians.  (AR 212-13, 366-68, 369, 416-17 (March 18, 2008 MRI of Nix's cervical spine ordered by Dr. Reininga and discussed at next appointment); AR 272-74, 356-60 (June 5, 2008 CT scan of Nix's cervical spine and Dr. Slaughter's accompanying report sent to Dr. Reininga and discussed at next appointments); AR 314, 354, 448, 466 (records from Nix's October 20, 2008 and March 16, 2009 visits to Dr. Fullerton sent to Dr. Reininga and discussed at appointments); AR 349, 470-71 (records from Dr. Kitzis' November 6, 2008 initial evaluation sent to Dr. Reininga and discussed at next appointment); AR 377-78, 431-32 (January 13, 2009 echocardiogram sent to Dr. Reininga); AR 421-430, 465 (records from Nix's March 2009 stay at St. Vincent Hospital sent to Dr. Reininga and discussed at next appointment); AR 454-56 (August 23, 2009 MRI of Nix's lumbar spine sent to Dr. Reininga);

AR 459, 485 (Nix's August 25, 2009 CT angiogram discussed at next appointment with Dr. Reininga).)[10]

However, I disagree with Nix that the ALJ's other reasons for assigning little weight to Dr. Reininga's opinion were improper or not supported by the record.  Nix argues that "the ALJ could only conclude that other physicians did not find [Nix] 'significantly limited' by distorting and disregarding their objective findings and conclusions . . . ."  (Doc. 18 at 18.)  However, I have already found that any error by the ALJ in omitting evidence did not undermine his RFC determination or cause his findings regarding Nix's impairments to not be supported by substantial evidence.  As a result, the ALJ's statement was correct that the record simply does not contain any other evidence in which Nix was found to be limited at anywhere near to the extent that Dr. Reininga found.  Additionally, aside from a few findings of tenderness, diminished oxygen levels, and elevated lab results, Dr. Reininga's records indeed do not demonstrate that he recorded objectively observed abnormalities or performed physical examinations of Nix.  (AR 341, 349, 462-63, 486-90.)

In light of the evidence supporting the ALJ's evaluation of Dr. Reininga's treating physician opinion, I cannot conclude that his assignment of "little weight" was not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Grogan*, 399 F.3d at 1261.  While the evidence would have permitted the ALJ to assign greater weight to the RFC assessment, it also supported an assignment of very little weight and I may not "displace the [ALJ's]

---

[10] Dr. Reininga also received records from Dr. Reyna and Dr. Simard.  (AR 491-93, 525-26.) However, Nix did not see Dr. Simard until after Dr. Reininga completed his RFC assessment and Nix saw Dr. Reyna on the same day that Dr. Reininga completed his RFC assessment.  (AR 478-81, 525-26.)  The record does not indicate whether Dr. Reininga had received Dr. Reyna's findings before he completed his RFC assessment.

choice between two fairly conflicting views." *Lax*, 489 F.3d at 1084.  On this point, it is again important that the ALJ chose to assign some weight to Dr. Reininga's assessment rather than rejecting it entirely.  (AR 20.)  The ALJ had to resolve a conflict between strict lifting, standing, sitting, and walking limitations and requirements assessed by Dr. Reininga that were not in line with the rest of Nix's medical record.  Although the ALJ concluded that Nix could lift more weight and stand and walk for longer than Dr. Reininga assessed (*compare* AR 23 with AR 278), the ALJ agreed  with Dr. Reininga that Nix required a clean working environment and the freedom to alternate between sitting and standing.  (AR 23-24.)  This second limitation is particularly significant because the SSR has cautioned that "[u]nskilled  types of jobs are particularly structured so that a person cannot sit or stand at will."  SSR 83-12, 1983 WL 31253 at *3.  In adopting some of Dr. Reininga's assessments but not others, the ALJ resolved conflicts in the record in a reasonable way and also avoided the requirement that "an ALJ may . . . reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."  *McGoffin*, 288 F.3d at 1252 (citation and emphasis omitted).  While the ALJ did partially evaluate Dr. Reininga's RFC assessment due to improper speculation, he did not reject the assessment outright.  As a result, I find that the ALJ's treatment of Dr. Reininga's treating physician was supported by substantial evidence.

### 4.  Collective Error

In light of the preceding analysis, I conclude that the ALJ's RFC determination is supported by substantial evidence and met with proper legal standards.  Although the ALJ omitted several pieces of relevant evidence, these errors did not undermine the ALJ's RFC determination.  The ALJ's assignment of non-controlling weight to Dr. Reininga's treating physician opinion, which was necessary in order for the ALJ to disagree with Dr. Reininga's RFC assessment, was also supported

by substantial evidence.  Consequently, I uphold the ALJ's decision at step four of the sequential evaluation process.

## STEP FIVE DETERMINATION

In his final claim, Nix argues that this case must be remanded at step five of the sequential evaluation process because the Commissioner failed to carry his burden of showing that Nix can perform jobs existing in significant numbers in the national economy that are consistent with Nix's RFC.  *Grogan*, 399 F.3d at 1261.  I agree with Nix and find that this case must be remanded so that the ALJ can determine whether Nix can work as a bakery line worker, photograph finisher, or shipping and receiving weigher despite his inability to work overhead with his arms.

The Tenth Circuit has held that an ALJ "must investigate and elicit a reasonable explanation for any conflict between the [Dictionary of Occupational Titles] and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability."  *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999).  This holding was based on the ALJ's duty to develop the record, the nature of a Social Security disability hearing as a nonadversarial proceeding, and the fact that it is the Commissioner's burden at step five to prove that a claimant retains a sufficient RFC to perform other jobs existing in significant numbers in the national economy.   *Id.* at 1090-91.  In *Haddock*, after the ALJ determined that the claimant (Haddock) had the RFC to perform sedentary, semi-skilled work that would allow him to sit or stand at his option, a VE testified in the form of a "summary conclusion" that Haddock could perform four jobs.  *Id.* at 1087, 1089.  The VE "[lumped] all four jobs together" and said that there were many thousands of the jobs in the regional and national economies.  *Id.* at 1087.  The ALJ did not question the VE further and ultimately decided that Haddock was not disabled because of the VE's testimony. *Id.*

However, on appeal Haddock argued that the ALJ's step five conclusion was not supported by substantial evidence because, according to the DOT, three of the four jobs proposed by the VE were described as having greater exertional and skill restrictions than sedentary and semi-skilled work. *Id.* at 1087-88. Haddock also argued that even though the remaining job, a payroll clerk, was listed as a sedentary and semi-skilled job, the ALJ's determination that Haddock could perform it was not supported by substantial evidence because the ALJ had not asked the VE to provide the specific number of payroll clerk jobs that existed in the economy. *Id.* at 1088. The court held that the ALJ "did not elicit enough evidence with regard to skills for us to assess whether there is a conflict between the Dictionary and the VE's testimony," which meant that it could not find that "the ALJ's conclusion that the identified jobs met the semi-skilled restriction he found the claimant to have is supported by substantial evidence." *Id.* at 1089. The case was remanded "for the ALJ to investigate whether there is a significant number of specific jobs Mr. Haddock could have done with his limitations." *Id.* at 1092.

Here, Nix argues that the ALJ similarly failed to elicit enough evidence to support his step five finding because the DOT provides that all three of the occupations proposed by the VE and accepted by the ALJ–bakery line worker, photograph finisher, and a shipping and receiving weigher–have a physical demand of at least "occasional" reaching, which is defined as "[e]xtending hand(s) and arm(s) in any direction."[11]   (Doc. 18, Ex. A at 5, 8, 10, 12.)  Nix claims that these physical demands conflict with the ALJ's RFC determination because the ALJ limited Nix to work

---

[11] The DOT lists a bakery line worker and a shipping and receiver weigher as requiring "occasional" reaching, and a photograph finisher as requiring "frequent" reaching. (Doc 18, Ex. A at 8, 10, 12.) The DOT defines "occasionally" as "activity or condition exists up to 1/3 of the time," and defines "frequently" as "activity exists from 1/3 to 2/3 of the time." (*Id.* at 5.) The DOT also has a category for "not present," which is defined as "activity or condition does not exist." (*Id.*)

"which does not entail . . . working overhead with the arms."  (AR 23.)  Nix also argues that there

was an additional conflict between the VE's testimony and the DOT because the VE responded to

a question from Nix's attorney by stating that his proposed occupations were "simple tasks, one, two

step jobs" (AR 550), yet the job descriptions in the DOT "show that each of the cited occupations

involve multiple tasks."  (Doc. 18 at 21 (citing Doc. 18, Ex. A at 7, 9, 11).)

      I find that Nix's second argument has no merit because, while the VE did testify that the jobs

were "simple . . . one, two step jobs," the ALJ did not adopt that limitation into his RFC

determination.  Instead, the ALJ determined only that Nix was "limited to non-complex work." (AR

23.)  As a result, it is immaterial whether the DOT descriptions are sufficiently different from "one,

two step jobs" to form a "conflict" that the ALJ should have investigated, and I easily conclude that

all three descriptions unambiguously outline non-complex work.  (Doc. 18, Ex. A at 7 (stating that

a bakery line worker, in addition to other tasks, "[s]mooths iced edges of cake, using spatula, and

moves decorating tool over top of designated caked to apply specified appearance."), 9 (stating that

a photograph finisher, in addition to other tasks, "[c]omputes price of order, according to size and

number of prints, and marks price on customer envelope."), 11 (stating that a shipping and receiving

weigher, in addition to other tasks, "[w]eighs and records weight of filled containers, cargo of loaded

vehicles, or rolls of materials, such as cotton, sugarcane, paper, cloth, plastic, and tobacco, to keep

receiving and shipping records . . . .").

      Nix's first argument, however, is more problematic.  There is an inconsistency between

occupations that all involve at least occasional "[e]xtending hand(s) and arm(s) in any direction"

(Doc. 18, Ex. A at 5) and a claimant who is limited to work "which does not entail . . . working

overhead with the arms."  (AR 23.) Furthermore, just as in *Haddock*, the VE presented his proposed

occupations in summary fashion and the ALJ did not question him further except to ask for the

specific numbers of the occupations in the national economy.  (AR 546-47.)  As a result, there was no questioning as to whether Nix could perform the VE's proposed occupations despite the fact that he could not work overhead with his arms.

In response, the Commissioner argues that I should find no conflict between the ALJ's RFC determination that adopted the VE's testimony and the DOT: (1) because "[t]he ALJ did not find any limitations in [Nix's] ability to reach"; and (2) because the DOT does not classify occupations in terms of the amount of *overhead* reaching required, Nix's claim of a conflict is "at best speculative."  (Doc. 19 at 22 (emphasis in original).)  I reject the first argument because I find that a limitation to work without "working overhead with the arms" is a partial limitation on Nix's ability to reach.  As for the Commissioner's second point, I agree with Nix that characterizing his argument as speculative only underscores the problem resulting from the lack of any questioning of the VE.  As Nix admits, all confusion could have been removed if the ALJ had simply asked the VE whether his proposed jobs would actually require overhead reaching, despite the physical demands listed in the DOT, but this does not happen.

In light of this open issue, I find that there is a conflict between the DOT and the VE's testimony which the ALJ did not investigate.  As a result, there is not substantial evidence supporting the ALJ's step five determination and this case must be remanded for the ALJ to elicit a reasonable explanation as to how Nix can perform the VE's proposed occupations despite his inability to work overhead with his arms.  *Haddock*, 196 F.3d at 1091.  While this issue is exceedingly minor compared to the other issues Nix has raised, it is undoubtedly the Commissioner's burden of proof at step five to show that the claimant retains a sufficient RFC to perform other jobs existing in significant numbers in the national economy.  *Grogan*, 399 F.3d at 1261.  For this reason, it is critical for the Commissioner to show that claimants can truly perform

the jobs that are found to be consistent with their residual functional capacities.  Here, because of the unresolved conflict between Nix's RFC and the DOT, I find that the Commissioner has not carried his burden.[12]

**CONCLUSION**

For the reasons stated above, the motion to reverse or remand is granted and this matter is remanded for proceedings consistent with this order.

William P. Lynch
United States Magistrate Judge

---

[12] On remand, the ALJ shall also question the VE to determine whether his proposed unskilled jobs would allow Nix to sit or stand at his option.  SSR 83-12 notes that "[u]nskilled types of jobs are particularly structured so that a person cannot sit or stand at will" and states that a VE "should be consulted to clarify the implications for the occupational base" when a claimant is limited to jobs that allow him to sit or stand at will. 1983 WL 31253, at *4.  Although the Commissioner notes that the *Haddock* holding only applies to conflicts between expert testimony and the DOT, as opposed to the social security rulings, SSR 83-12 nonetheless provides that ALJs should confirm that proposed unskilled jobs would allow a claimant to sit or stand at his option when the claimant is so limited.  While Nix's attorney did partially question the VE regarding this matter (AR 548-49), the ALJ did not and shall do so on remand..